

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**20 CV 7628**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. |
| ADAM P. ROGAS, | |
| Defendant, | |
| and | |
| NS8 FP, LLC, MVP 2020, LLC, AND ROGASSI ENTERPRISES, LLC, | |
| Relief Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* EMERGENCY MOTION FOR ASSET FREEZE, ORDER TO SHOW CAUSE, AND OTHER RELIEF**

Gregory A. Kasper
Polly Atkinson*
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1026 (Kasper)
(303) 844-1046 (Atkinson)
KasperG@SEC.gov
AtkinsonP@SEC.gov

*Motion for *Pro Hac Vice* pending

Table of Contents

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................2

I.    Background of Key Entities and Individuals ................................................2

    A.    NS8, Inc ..........................................................................................2

    B.    Defendant and Relief Defendants .....................................................2

    C.    Investors .........................................................................................3

II.    NS8's 2019 and 2020 Securities Offerings................................................4

III.    Rogas Falsified NS8's Bank Statements....................................................4

IV.    The False Statements Were Provided To Investors in The 2019 And 2020 Offerings .............................................................................................7

V.    Other False Financial Information Was Provided to Investors In 2019 And 2020 Offerings ........................................................................................8

VI.    NS8, Through Rogas Offered And Sold Securities To Investor B Within The Southern District of New York ..........................................................9

VII.    Rogas Received Over $17.5 Million From The 2020 Offering ...................9

ARGUMENT ........................................................................................................9

I.    THE COURT SHOULD FREEZE $35 MILLION OF THE ASSETS OF ROGAS AND THE RELIEF DEFENDANTS............................................10

    A.    The Burden for the SEC to Obtain an Asset Freeze is Not Onerous ................10

    B.    There is Strong Evidence that Rogas Engaged in Securities Fraud...................11

        1.    Rogas engaged in deceptive conduct and made materially false Statements ...............................................................................12

            a.    Rogas engaged in deceptive conduct ..................................12

            b.    Rogas made materially false statements ..............................13

                i.    The statements were false ................................................13

                ii.    Rogas obtained money by means of the false statements.............14

                iii. Rogas was the maker of the statements .........................14

                iv. The statements were material...........................................14

2.   Rogas has the requisite scienter ................................................................14

3.   Rogas's fraud was in the offer and sale of securities...............................15

4.   Rogas used interstate commerce ...............................................................15

C.   An *Ex Parte* Asset Freeze Order Should Enter Because of the Serious
Risk that the Assets Will Be Dissipated .............................................................15

D.   The Court Should Issue an Order Requiring an Accounting, Prohibiting
The Destruction of Documents, and Authorizing Expedited Discovery and
Alternative Service.............................................................................................16

1.   An order for an accounting is necessary to determine the scope of
Fraud and Defendant's ability to repay investors ......................................17

2.   An order to prevent document destruction is necessary to preserve
evidence .....................................................................................................18

3.   Allowing expedited discovery will protect investors.................................18

4.   Alternate service is appropriate in this matter ..........................................18

CONCLUSION.............................................................................................................19

Table of Authorities

Cases

*Aaron v. SEC*, 446 U.S. 680 (1980) ........................................ 12

*Basic v. Levinson*, 485 U.S. 224 (1988) ................................... 15

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) .................. 14-15

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ................................. 13

*Robare Group, Ltd. v. SEC*, 922 F. 3d 468 (D.C. Cir. 2019) ................. 12-13

*SEC v. Babikian, No. 14 CIV.* 1740 PAC, 2014 ........................... 19

*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) ..................... 18

*SEC v. Byers, No. 08 Civ. 7104* (DC), 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ...................... 10

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ......................... 10

*SEC v. Credit Bancorp Ltd., No. 99 Civ. 11395*, 2010 WL 768944

(S.D.N.Y. Mar. 8, 2010) ....................................... 11, 16

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) .............. 12

*SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990) ........... 18

*SEC v. Maillard, No. 13-cv-5299* (VEC), 2014 WL 1660024

(S.D.N.Y. April 23, 2014) ..................................... 11, 11

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) ......... 16, 17

*SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391 (S.D.N.Y. 2016) ........ 16

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ............................. 12

*SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104 (S.D.N.Y. 1992) ...... 18

*SEC v. Spongetech Delivery Sys., Inc., No. 10-cv-2031*, 2011 WL 887940

(E.D.N.Y. Mar. 14, 2011) ..................................... 18

*SEC v. Unifund SAL* SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir. 1990) ....... 10, 18

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ............................. 10, 16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ...... 13

*TSC Industries Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .............. 15


Rules and Statutes

15 U.S.C. § 77q ...................................................... 11

15 U.S.C. § 78aa .................................................... 17

15 U.S.C. § 78j ............................................................................................................... 12

15 U.S.C. § 78u ............................................................................................................... 17

15 U.S.C. §§ 77q ....................................................................................................... 11, 12

17 C.F.R. § 240.10b-5 ..................................................................................................... 12

17 C.F.R. §§ 240.10b–5 ............................................................................................. 12, 12

Fed. R. Civ. P. 4 ............................................................................................................. 19

Fed. R. Civ. P. 65 ..................................................................................................... 17, 19

Plaintiff, the United States Securities and Exchange Commission ("SEC"), respectfully submits this Memorandum of Law in support of its *Ex Parte* Emergency Motion for an Asset Freeze, Order to Show Cause, and Other Relief against Defendant Adam Rogas and Relief Defendants NS8 FP, LLC, MVP 2020, LLC, and Rogassi Enterprises, LLC. The SEC also submits the attached Declaration of Eric Day with exhibits in further support of its Motion.

## PRELIMINARY STATEMENT

Adam P. Rogas, the Chief Executive Officer of NS8, Inc., a private e-commerce company, defrauded investors by using forged documents to entice investors to purchase NS8 securities worth between $25 and $60 million in the fall of 2019 and NS8 securities worth over $73 million in the spring of 2020. Then, in June 2020, Rogas and one of the relief defendants he controls redeemed NS8 securities and pocketed over $17.5 million that had been raised through his fraud.

The declaration and exhibits submitted with this Memorandum demonstrate that there is strong evidence that Rogas defrauded investors in connection with the offer and sale of NS8 securities and received over $17.5 million by doing so. The brazenness of Rogas's fraud and the skill with which he covered his tracks further indicates that there is serious risk that Rogas or the Relief Defendants, which are controlled by or related to him, could transfer funds or hide assets.

The SEC, therefore, seeks an emergency asset freeze and related relief to preserve the status quo and to protect this Court's ability to enter a meaningful judgment of disgorgement, prejudgment interest, and monetary penalties in this action.

Accordingly, the SEC respectfully requests that the Court enter an order:

1

(1) freezing $35,084,900 of funds, including those funds in certain enumerated accounts, and other assets of Defendant and Relief Defendants, wherever located;

(2) requiring Defendant and Relief Defendants to provide accountings of all funds or other assets received in 2020 through an equity redemption of NS8, Inc. securities and any other funds received or obtained from any NS8 investor at any time;

(3) prohibiting the destruction or alteration of documents;

(4) providing for expedited discovery;

(5) allowing alternative service by the SEC; and

(6) directing Defendant and Relief Defendants to appear and show cause why the asset freeze and other relief should not remain in place pending final resolution of this matter.

## STATEMENT OF FACTS

### I.   Background of Key Entities and Individuals.

#### A.   NS8, Inc.

**NS8, Inc.** is a Delaware corporation with its principal place of business in Las Vegas, Nevada. Declaration of Eric Day at ¶ 11. NS8 was formed by Adam Rogas and others in August 2016. *Id*. NS8 is a technology company that provides online fraud detection and prevention services through various e-commerce platforms. *Id*. In October 2019 and May 2020, NS8 filed Forms D with the SEC in connection with offerings of securities purportedly made under the exemption set forth in Rule 506(b) of Regulation D. *Id*.

#### B.   Defendant and Relief Defendants

**Adam Rogas** is a founder and the former chief executive officer of NS8. *Id*. at ¶ 12. On September 1, 2020, Rogas resigned from NS8. *Id*. Rogas is also an owner and member of NS8

2

FP, LLC, and is the manager of Rogassi Enterprises, LLC and appears to be associated with 2020 MVP, LLC. *Id*. In June 2020, Rogas received $10,000,009 in an equity redemption of NS8, Inc. shares. *Id*.

**NS8 FP, LLC** is a Wyoming limited liability company formed in August 2019 and owned by Rogas. *Id*. at ¶ 13. In June 2020, NS8 FP, LLC received $7,542,450 in an equity redemption of NS8, Inc. shares. *Id*.

**2020 MVP, LLC** is a Nevada limited liability company.  *Id*. at ¶ 14. It appears that on July 17, 2020, Rogas transferred ownership of his Las Vegas, Nevada residence to 2020 MVP, LLC through a nominal grant deed transfer. *Id*.

**Rogassi Enterprises, LLC** is a Nevada limited-liability company formed by Rogas in April 2009. *Id*. at ¶ 15. Rogas is also its manager. *Id*. Rogas appears to hold title to at least two vehicles through Rogassi Enterprises, LLC, a 2020 Audi S8 sedan and a 2018 Audi S5 Prestige sedan. *Id*.

### C.    Investors.

**Investor A** is a venture capital firm with offices in California. *Id*. at ¶ 16. Entities associated with Investor A invested $24,149,994.91 in the 2019 Offering and $24,999,986.10 in the 2020 Offering. *Id*.

**Investor B** is an international investment firm with offices in Manhattan. *Id*. at ¶ 17. Entities affiliated with Investor B invested $14,999,995.43 in the 2019 Offering and $7,499,997.71 in the 2020 Offering. *Id*.

**The Consultant** is a global consulting firm that Investor A hired to assist with diligence efforts in advance of purchasing NS8 securities in 2019 and a group of investors,

including both Investor A and Investor B, hired to assist in their diligence efforts in advance of purchasing NS8 securities in 2020. *Id*. at ¶ 18.

## II.      NS8's 2019 And 2020 Securities Offerings.

In the fall of 2019, NS8 engaged in a securities offering ("2019 Offering"). *Id*. at ¶ 19. The 2019 Offering raised over $49 million in proceeds through the sale of Series A preferred stock to at least ten investors. *Id*.

In the spring of 2020, NS8 engaged in another securities offering ("2020 Offering"). *Id*. at ¶ 20. The 2020 Offering raised over $73 million through the sale of Series A preferred stock to at least fifteen investors. *Id*.

## III.     Rogas Falsified NS8's Bank Statements.

NS8 maintained an account at Silicon Valley Bank that was used to pay NS8's business expenses and received some investor funds. *Id*. at ¶ 21. Several NS8 employees had access to this account. *Id*. NS8 also maintained an account at Bank of America, which was used to collect revenue from NS8's customers (the "Revenue Account"). *Id*. Rogas was the only person with online login credentials for the Revenue Account or access to its monthly statements.  *Id*. at ¶ 22.

For the time period January 2018 through July 2020, the account balances in the Revenue Account were overstated every month ("the False Statements"). *Id*. at ¶ 26. The False Statements included altered line items of dollar amounts (which were overstated) and, in some cases, altered payor names and details.  *Id*. at ¶ 27. This table the monthly balances of the Actual versus False Statements:

4

| Month | Actual Balance | Falsified Balance | Falsely Inflated Amount |
|---|---|---|---|
| Jan-18 | $101,189.80 | $1,138,353.63 | $1,037,163.83 |
| Feb-18 | $103,483.35 | $1,291,295.06 | $1,187,811.71 |
| Mar-18 | $77,823.09 | $1,444,413.21 | $1,366,590.12 |
| Apr-18 | $60,539.44 | $1,644,931.28 | $1,584,391.84 |
| May-18 | $63,864.84 | $1,925,578.12 | $1,861,713.28 |
| Jun-18 | $49,932.17 | $2,262,786.57 | $2,212,854.40 |
| Jul-18 | $51,052.84 | $2,690,807.00 | $2,639,754.16 |
| Aug-18 | $54,208.04 | $3,165,174.61 | $3,110,966.57 |
| Sep-18 | $56,635.29 | $3,730,668.41 | $3,674,033.12 |
| Oct-18 | $10,272.39 | $4,373,334.17 | $4,363,061.78 |
| Nov-18 | $1,869.86 | $5,136,414.04 | $5,134,544.18 |
| Dec-18 | $2,859,995.28 | $8,869,155.52 | $6,009,160.24 |
| Jan-19 | $4,076,163.35 | $15,145,101.78 | $11,068,938.43 |
| Feb-19 | $4,078,713.60 | $15,025,236.22 | $10,946,522.62 |
| Mar-19 | $3,925,343.94 | $15,787,765.08 | $11,862,421.14 |
| Apr-19 | $1,001,042.96 | $13,587,745.76 | $12,586,702.80 |
| May-19 | $1,004,558.83 | $14,993,052.97 | $13,988,494.14 |
| Jun-19 | $506,578.00 | $16,681,077.44 | $16,174,499.44 |
| Jul-19 | $12,284.67 | $17,479,624.51 | $17,467,339.84 |
| Aug-19 | $6,012.48 | $17,992,113.81 | $17,986,101.33 |

| Month | Actual Balance | Falsified Balance | Falsely Inflated Amount |
|---|---|---|---|
| Sep-19 | $5,636.10 | $23,745,307.13 | $23,739,671.03 |
| Oct-19 | $12,339.52 | $26,126,231.51 | $26,113,891.99 |
| Nov-19 | $22,726.71 | $29,150,181.27 | $29,127,454.56 |
| Dec-19 | $32,719.24 | $34,495,297.68 | $34,462,578.44 |
| Jan-20 | $39,005.42 | $38,149,825.57 | $38,110,820.15 |
| Feb-20 | $45,407.75 | $42,244,565.43 | $42,199,157.68 |
| Mar-20 | $52,983.78 | $46,945,839.43 | $46,892,855.65 |
| Apr-20 | $59,389.31 | $51,559,561.43 | $51,500,172.12 |
| May-20 | $70,363.81 | $56,193,852.43 | $56,123,488.62 |
| Jun-20 | $28,051.47 | $62,088,506.43 | $62,060,454.96 |

*Id.* at ¶26.

Rogas would download the Revenue Account monthly bank statements and would then provide them to the finance department. *Id.* at ¶ 23. The finance department then relied on those Revenue Account statements in preparing the company's financial statements. *Id.* The statements, and summary materials derived from them, provided by Rogas were the statements that NS8's finance department used until September 2020. *Id.*

In late August 2020, in an attempt to get additional login credentials, one employee in the finance department learned the balance in the Revenue Account was more than $60 million lower than the Revenue Account statements that he had access to showed. *Id.* at ¶ 24.

IV.     **The False Statements Were Provided To Investors In The 2019 And 2020 Offerings.**

Emails show that NS8 provided financial information to current and potential investors, including investors A and B and their consultant, via email and Dropbox, an electronic file sharing system. *Id*. at ¶ 28.

In connection with Investor A's investment in the 2019 Offering, on November 15, 2019, the consultant requested from NS8 "[m]onthly detailed bank statements and reconciliations for all accounts for the periods March 2019 through October 2019."  *Id*. at ¶ 29. A member of the NS8 finance department responded, "[w]e have updated the [electronic shared file] . . .  adding the additional [Revenue Account] Statements (sorry not sure how we missed that)." *Id*. The statements provided to the consultant were the False Statements and they used those False Statements to prepare a report for Investor A. *Id*. The consultant's 2019 report addressed the quality of NS8's revenue, finding that NS8's revenue recognized was supported by actual cash receipts pursuant to the Revenue Account bank statements. *Id*. at 31.¶

In connection with the 2020 Offering, a group of investors, including Investor A and Investor B, again retained the consultant to provide updated due diligence. *Id*. at ¶ 32. Again, the consultant was provided with the False Statements. *Id*.

Upon reviewing the False Statements, the consultant noticed a discrepancy between the August 2019 statements, asking "[w]hy do the Aug19 [Revenue Account] bank statement deposits not subtotal within the bank statements? *Id*. at ¶ 33. The individual line items add up to $2.3M in deposits while the total deposits presented is $3.3M." *Id*. Rogas claimed that he "re-

7

pulled the statements from Aug through Feb for my own sanity." *Id*. at ¶ 34. The "new"

statement added up to $3.3M. *Id*.

The consultant also asked to see the actual online statements for the Revenue Account

during an in-person review. *Id*. at ¶ 36. Rogas provided the False Statements to an employee of

consultant. *Id*. at ¶ 37. Based on its review of the information provided by NS8, including the

False Statements, the consultant provided an updated report, a draft of which is dated March 12,

2020. *Id*. at ¶ 38. The report also addressed the quality of NS8's revenue, finding that NS8's

recognized revenue was supported by actual cash receipts pursuant to the Revenue Account bank

statements. *Id*. After receiving information in the report, Investor A invested approximately $25

million. *Id*. at ¶ 39.Investor B invested approximately $7.5 million in the 2020 Offering in

addition to the nearly $15 million it had invested in the 2019 Offering. *Id*. at ¶

## V.     Other False Financial Information Was Provided To Investors In The 2019 And 2020 Offerings.

Balance sheets and other financial statements derived from the False Statements were

made available to potential investors in the 2019 and 2020 Offerings through an electronic file

sharing system. *Id*. at ¶ 40. Those balance sheets significantly inflated NS8's assets. For

example, the falsified balance sheet showed balances of $38,149,825.57 and $42,244,565.43 for

January and February 2020 when the balance was actually $39,005.42 and $45,407.75. *Id*. at

¶42.

In another example, in a January 14, 2019 email to an existing investor, Rogas attached

an NS8 balance sheet with a line item for the falsified bank account that read "BofA Checking."

*Id*. at ¶ 43. That line item reflects the false account balances for each month of 2018. *Id*. For

example, the line item for November 2018 shows a balance of $4,900,673.16 when the actual balance was $1,869.86.

### VI.     NS8, Through Rogas, Offered And Sold Securities To Investor B Within The Southern District Of New York.

The partner of Investor B was in Manhattan when Investor B completed the documentation to purchase NS8 shares in September 2019. *Id*. at ¶ 44. In addition, in connection with the 2020 Offering, Rogas had further communications with Investor B while one or more of the partners was living and working in Manhattan. *Id*. at ¶ 45.

### VII.    Rogas Received Over $17.5 Million From The 2020 Offering.

In June 2020, the redemption anticipated in the 2020 offering documents occurred.  In connection with the redemption, Rogas received $10,000,009 personally and $7,542,450 through NS8 FP, LLC. *Id*. at ¶ 46.

### <u>ARGUMENT</u>

Emergency preliminary relief is appropriate in this matter because Rogas clearly and flagrantly violated the anti-fraud provisions of the securities laws. The nature of Rogas's fraud – forging documents, knowing that those documents would be provided to investors and regulators, while pocketing $17.5 million – demonstrates a risk that Rogas will dissipate or conceal his remaining assets and falsify evidence absent an order freezing assets, requiring an accounting, and preserving evidence.

9

I. **THE COURT SHOULD FREEZE $35 MILLION OF THE ASSETS OF ROGAS AND THE RELIEF DEFENDANTS.**

   A. The Burden for the SEC to Obtain an Asset Freeze is Not Onerous.

The SEC seeks an immediate asset freeze on an emergency basis. To obtain such relief, the SEC need only show an inference that the defendant has violated the securities laws. *See, e.g.*, *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Cavanagh*, 155 F.3d 129, 132, 135 (2d Cir. 1998). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To obtain an asset freeze, the SEC "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (citing *Byers*, 2009 WL 33434, at *3). As emphasized by the Second Circuit in *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), "the SEC should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.*; *see also Byers*, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction."). "A freeze is particularly warranted where" – as here – "the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, No. 99 Civ. 11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

Upon making the required showing, the SEC is entitled to an asset freeze "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." *SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014).

Because Congress has authorized a civil penalty equal to at least the amount of disgorgement, it is appropriate for the Court to freeze funds sufficient to pay both the disgorgement and penalty amount that may eventually be due. *See Id*.

    B.   <u>There is Strong Evidence that Rogas Engaged in Securities Fraud.</u>

    Section 17(a) of the Securities Act of 1933 prohibits fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce. *See* 15 U.S.C. §§ 77q(a).[1] Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of a security. *See* 15 U.S.C. § 78j(b);[2] 17 C.F.R. §§ 240.10b–5(a), (b) & (c).[3] Courts apply "essentially the same" tests for determining

---

[1] Section 17(a) provides: "It shall be unlawful for any person in the offer or sale of any securities … by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
    (1) to employ any device, scheme, or artifice to defraud, or
    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."
15 U.S.C. § 77q(a).

[2] Section 10(b) provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
… (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j.

[3] Rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

liability under Section 17(a), Section 10(b), and Rule 10b–5. *See SEC v. Haligiannis,* 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007).

To establish a violation under these anti-fraud provisions, the SEC must prove that a defendant: (1) made a material false statement or material omission or engaged in deceptive conduct, (2) in connection with the offer, sale, or purchase of a security, (3) by means of interstate commerce. *See* 15 U.S.C. §§ 77q(a), 15 U.S.C. § 78j(b)10(b), 17 C.F.R. §§ 240.10b–5(a), (b) & (c).  Further, scienter is required to prove a violation of Section 17(a)(1), Section 10(b), and Rule 10b–5, while Section 17(a)(2) and (3) can also be proven by showing a defendant acted negligently. *Aaron v. SEC*, 446 U.S. 680, 695 (1980). Scienter is established by a showing of knowledge or recklessness. *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). Negligence "is the failure to 'exercise reasonable care under all the circumstances.'" *Robare Group, Ltd. v. SEC*, 922 F. 3d 468, 477 (D.C. Cir. 2019) (quoting Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010)).

> 1.  *Rogas engaged in deceptive conduct and made materially false statements.*

It is beyond dispute that Rogas engaged in deceptive conduct and made materially false statements in connection with the offer and sale of securities.

> a.  Rogas engaged in deceptive conduct.

Rogas falsified the statements for the NS8 Revenue Account. Rogas revised the statements to inflate the amount of payments NS8 was receiving from NS8's customers, inflating the amount of funds in NS8's Revenue Account by tens of millions of dollars. Rogas then provided those forged bank records to prospective investors in connection with two offerings of NS8 shares that raised over $98 million from investors, including an offering that was

12

specifically designed to provide funds for redemption of NS8 shares owned by Rogas and others.

Rogas also provided these forged bank records to the NS8 finance department, knowing that the

fake documents would be used to prepare NS8 financial statements and other financial

information. Fake documentation used in securities offerings is deceptive conduct. *See*

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008).

　　　　b.　Rogas made materially false statements.[4]

As part of his fraudulent conduct, Rogas also made materially false statements. Rogas's

provided forged bank statements and financial statements and information based on those forged

bank statements to individuals doing due diligence in anticipation of purchasing NS8 shares by

email and through drop-boxes. Rogas also personally made misstatements concerning NS8's

financial condition and revenues in presentations to investors using video conferencing. As a

result, he made materially false statements in the offer and sales of securities.

　　　　i.　The statements were false.

Rogas falsified the bank records, changing the amount of payments received by hundreds

of thousands of dollars, resulting in the inflation of NS8's Revenue Account by tens of millions

of dollars. As a result, any written and oral statements to investors referencing the Revenue

Account were false and misleading.

---

[4] These false statements serve as the basis for liability under Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) as well as being material misrepresentations under Section 17(a)(2) and Rule 10-5(b). *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) ("[T]he Court and the SEC have long recognized considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws.")

ii.   Rogas obtained money by means of the false statements.

Rogas provided the forged bank documents to investors or their agents who were considering investing in NS8's securities offerings. One of the stated purposes of the 2020 offering was to generate money to fund the redemption of NS8 shares owned by Rogas and others. In fact, investors bought NS8 shares, NS8 shares owned by Rogas were redeemed, and Rogas and his related entity received over $17.5 million.

iii.   Rogas was the maker of the statements.

Rogas was "the maker" of the false statements. Under Rule 10b-5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its contents and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Rogas created the false bank statements and personally provided the false bank statements to investors. He was responsible for the contents of the false documents and for whether and how they were communicated.

iv.   The statements were material.

Information is considered material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell securities. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976). Investors would have considered it material that NS8's revenues were inflated by tens of millions of dollars.

2.   *Rogas had the requisite scienter.*

Rogas acted intentionally. One cannot accidently alter bank records to change customer payments from less than $100 to $500,000. Rogas intended to make it appear that NS8's

14

revenues were tens of millions of dollars more than they actually were. Moreover, Rogas intentionally provided those falsified bank records to NS8 investors and potential NS8 investors. Rogas's actions were intentional, knowing, and reckless.

### 3. Rogas's fraud was in the offer and sale of securities

Rogas's fraudulent conduct and misstatements – creating false bank documents and sending them to potential investors – was in the offer of securities. In addition, securities were sold to NS8 investors and Rogas sold NS8 shares belonging to him.

### 4. Rogas used interstate commerce.

Rogas sent the falsified bank statements by email and used internet drop-boxes to provide the fake bank statements to investors. Interstate methods of communication, such as the Internet or e-mail, constitute "instrumentalities" of interstate commerce. *SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 398-399 (S.D.N.Y. 2016).

### C. An *Ex Parte* Asset Freeze Order Should Enter Because of the Serious Risk that the Assets Will Be Dissipated.

For the reasons described above, the SEC has carried its burden to show that Rogas violated the federal securities laws. The SEC has certainly met the lower burden of demonstrating that "an inference can be drawn that [Rogas has] violated the federal securities laws." *Smith*, 653 F.3d at 128. An asset freeze is appropriate on that basis alone, but three additional reasons make an asset freeze appropriate here.

First, "[a] freeze is particularly warranted where the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the

fraudulent nature of the appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money.")). Rogas's misrepresentations, omissions, and other fraudulent and deceptive conduct involved blatant and egregious fraud.

Second, proceeding *ex parte* for a temporary asset freeze is appropriate here because there is a risk of asset dissipation and Defendant and Relief Defendants will have an opportunity to conceal or dissipate assets if they are provided with advance notice of an asset freeze order. A certification made pursuant to Fed. R. Civ. P. 65(b)(1)(B) is submitted with this emergency request.

Third, the amount of assets subject to the freeze order should be sufficient to cover awards of disgorgement and a civil penalty authorized under Section 20(d)(1) of the Securities Act and Section 21(d)(3)(A) of the Exchange Act. Accordingly, the Court should freeze $35,084,900 of Defendant and Relief Defendant's assets; an amount sufficient to cover disgorgement of $17,542,450 and a civil penalty in the amount equal to disgorgement of $17,542,450.

    D.   <u>The Court Should Issue an Order Requiring an Accounting, Prohibiting the Destruction of Documents, and Authorizing Expedited Discovery and Alternative Service.</u>

Exchange Act Section 21(d)(5) authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Section 27 of the Exchange Act, 15 U.S.C. § 78aa, provides the Court general equitable powers in SEC actions. *Manor Nursing Centers*, 458 F.2d at 1103-04. Pursuant to such powers, this Court may order ancillary relief to effectuate the purposes of the federal securities laws and to ensure that

wrongdoers do not profit from their unlawful conduct. *Id*. The Court should enter an order requiring Rogas and the Relief Defendants to provide accountings of all funds received in 2020 from redemption of NS8 securities and of any other funds received from NS8 investors at any time; prohibit Rogas, or any of his agents, or anyone acting in concert with him, from destroying and altering documents to preserve as much of the evidence as possible; allowing expedited discovery; and providing for alternative service of documents.

1. *An order for an accounting is necessary to determine the scope of fraud and Defendant's ability to repay investors*.

To accurately determine the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide a verified accounting of all monies or property obtained as a result of the fraudulent activity, as well as their current financial resources or assets. *See, e.g., SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031,2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (noting that ordering an accounting is "minimally intrusive") (citing *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)); *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). In this case, Rogas has used an entity to receive investor funds and has transferred his multi-million dollar home into another entity. A prompt and complete accounting will help determine what investor funds Rogas and the Relief Defendants received, what assets exist and where they are located, which, in turn, will assist the effectiveness of the asset freeze order. Thus, an accounting remedy is needed here to determine: (1) the amount of Rogas's ill-gotten gains; (2) the disposition of his assets; and (3) the assets available for disgorgement.

2. *An order to prevent document destruction is necessary preserve evidence.*

An order to prevent despoliation is appropriate in this case. Courts grant such orders to protect the integrity of the litigation. *See Unifund SAL*, 910 F.2d at 1040 n. 11 (upholding an order prohibiting the alteration or destruction of documents); *Spongetech Delivery*, 2011 WL 887940, at *5 (citing *Unifund SAL*, 910 F.2d at 1040 n. 11). The very nature of Rogas's fraud involves falsification of documents. An order preventing destruction or further alteration of documents will preserve the status quo and ensure evidence is available for determination on the merits.

3. *Allowing expedited discovery will protect investors.*

As is clear from the SEC's complaint in this matter, several of the events constituting Rogas's fraud came to light in the last 10 days. As a result, the SEC has not fully determined the extent of Rogas's fraud or the location of his assets. Expedited discovery will allow the SEC to more fully understand these issues and protect investors. Moreover, while the SEC is seeking any accounting, expedited discovery will allow the SEC to analyze financial records and movement of funds in a timely fashion. This will enable the SEC to freeze all appropriate assets for the protection of investors.

4. *Alternate service is appropriate in this matter.*

Finally, due to the expedited procedure under Fed. R. Civ. P. 65, the SEC also requests that the Court permit alternative means of service, specifically service by email, so that Defendant and Relief Defendants can be heard at the requested show cause hearing with reasonable notice. *See, e.g., SEC v. Babikian*, No. 14 CIV. 1740 PAC, 2014 WL 2069348, at *1

18

(S.D.N.Y. Apr. 21, 2014) (alternative service of process via email permitted on defendant in connection with asset freeze and temporary restraining order.).

The core consideration under Rule 4(f) is whether service is "reasonably calculated to give notice" to a defendant. Fed. R. Civ. P. 4(f). Here, service by e-mail is reasonably calculated to reach Rogas. This alternate method of service is narrowly tailored to the circumstances of the case and designed to give Rogas actual notice and a meaningful opportunity to respond to the SEC's motion for an asset freeze. The SEC has been notified that Rogas is represented by counsel and the SEC will serve that counsel with all papers as soon as the asset freeze is entered.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying declaration and exhibits, the SEC respectfully requests that the Court grant the SEC's motion and issue the requested order.

Dated: September14, 2020

Respectfully submitted,

Gregory A. Kasper
Polly Atkinson*
Attorney for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1026
(303) 844-1046 (Atkinson)
KasperG@SEC.gov
AtkinsonP@SEC.gov

*Motion *Pro Hac Vice* pending.

19