UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES SECURITIES AND :
EXCHANGE COMMISSION, :
  :
  :
*Plaintiff,* :
v. :
  : **DECISION & ORDER**
  :
ADAM P. ROGAS and PAUL G. KOROL, :
  : 20-cv-7628 (RMB)
*Defendants,* :
and :
  :
NS8 FP, LLC, MVP 2020, LLC, and :
ROGASSI ENTERPRISES, LLC, :
  :
*Relief Defendants.* :
------------------------------------------------------------X

I. **Introduction**

This Decision and Order resolves a disagreement among the Securities and Exchange Commission ("SEC"), Adam P. Rogas ("Rogas") (who has been convicted and sentenced for securities fraud), and Rogas' counsel, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). The dispute is over (approximately) 4 million dollars which were transferred by Rogas to Pillsbury on September 9, 2020.[1]

The Honorable Paul A. Crotty entered a Temporary Restraining Order ("TRO") freezing Rogas' assets on September 17, 2020.[2] The SEC requests that this Court direct Pillsbury to turn

---

[1] Rogas contacted Pillsbury partner William Sullivan in late August of 2020 about "the need for potential personal representation in connection with [Rogas'] role as President and Chief Executive Officer [] of [a technology company named] NS8, Inc." SEC Mot. Ex. 1, dated Sept. 5, 2023 ("Rogas Decl."), at ¶ 3. Rogas "made the decision that [he] wanted to engage Mr. Sullivan and Pillsbury in connection with any litigation concerning [his] time at NS8, and [he] informed Mr. Sullivan of [his] desire to retain him and Pillsbury." *Id.* at ¶ 4.

[2] This case was reassigned from the Judge Crotty to this Court on March 15, 2024.

over with interest the Rogas funds as of September 18, 2020 (which was the date Pillsbury and Rogas were served with the TRO).[3]

Having reviewed the record herein, including without limitation: (1) the TRO which became the Freeze Order on September 24, 2020;[4] (2) the SEC motion, dated May 3, 2024, seeking to compel Pillsbury to return $3,612,601.76 (so that these monies can be distributed to defrauded investors); (3) the Pillsbury motion, dated May 17, 2024, "seeking confirmation that the Court's Asset Freeze Order does not apply to [money which Rogas transferred to] Pillsbury"; and (4) the oral argument held on July 10, 2024 at which the Court learned that Pillsbury had been billing against (depleting) Rogas' funds.

Excerpts from the oral argument before this Court on July 10, 2024 provide a helpful summary of the dispute and include the following:

> **SEC:** [T]his dispute is about Pillsbury wanting to keep nearly $4 million of defrauded investors' money that it received from its client, Adam Rogas, only days before the SEC and DOJ charged him with fraud and this Court issued an Asset Freeze. . . .

---

[3] The TRO and the September 24, 2020 Freeze Order each required that "Defendant, Relief Defendants [NS8 FP, LLC; 2020 MVP, LLP; and Rogassi Enterprises, LLC], and their officers, directors, successor corporations, subsidiaries, affiliates, trustees, family members, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order . . . shall . . . prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control . . . , in whatever form such assets may presently exist and wherever located, up to $35,084,900." TRO, dated Sept. 17, 2020, at I.B; Freeze Order, dated Sept. 24, 2020, at I.B.

The Relief Defendants are (1) NS8 FP, LLC, which was owned by Rogas and "received $7,542,450" of Rogas' fraud proceeds; (2) 2020 MVP, LLC, to which Rogas "transferred ownership of his Las Vegas, Nevada residence"; and (3) Rogassi Enterprises, LLC, limited-liability company formed by Rogas to hold "a 2020 Audi S8 sedan and a 2018 Audi S5 Prestige sedan." SEC Brief Supporting Motion for TRO, dated Sept. 14, 2020, at 2.

[4] The Freeze Order extended the requirements of the TRO through "resolution of the merits of this matter."

2

Just to very briefly recap some of the initial facts, it was on September 17, 2020, that Pillsbury client Adam Rogas was charged by the SEC and arrested by DOJ for a wide-ranging fraud with over $100 million of investor losses. This Court issued an asset freeze order the same day, and Pillsbury was served with that asset freeze order the next day. We now know that on September 9, 2020, only eight days earlier, Rogas transferred $4 million to Pillsbury. And this was right after he told Pillsbury information that led Pillsbury to believe that he would be imminently charged by criminal authorities and the SEC. Oral Arg. Tr., dated July 10, 2024, at 3:3–8, 3:11–21. . . .

Pillsbury never disclosed to the SEC or the Court that it had received this retainer. And it never gave the SEC or the Court an opportunity to weigh in on its view that it professes now that the asset freeze did not apply to those funds. The first time that Pillsbury disclosed to the SEC even the existence of the retainer was in September 2022, nearly two years after the asset freeze was entered. And when it made that disclosure, it said that those funds were assets of Defendant Rogas held in escrow by Pillsbury Winthrop. *Id.* at 4:9–18. . . .

[N]one of Pillsbury's arguments stand up to scrutiny. First, throughout the opening brief, Pillsbury argues that it should be entitled to keep the funds because the SEC knew that it was billing against a $4 million retainer throughout the asset freeze. That is simply false. . . . In the reply, Pillsbury concedes that [the first time] it told the SEC it even received a retainer was in September 2022, two years after the asset freeze was in place and after it now claims that it billed millions of dollars against this retainer. *Id.* at 7:6–17. . . .

**Court**: [to Pillsbury] [W]hy is it not clear that this money was obtained by fraud and that the money belongs to the people who got defrauded? *Id.* at 12:11–13. . . .

**Pillsbury:** [A]t the time we received the money, we had no reason to believe or understand that it came from the fraud. *Id.* at 13:20–22. . . . The relevant inquiry is whether counsel had serious concerns or substantial issues with the source of the money. We had none. *Id.* at 15:7–9. . . .

**Court:** I read that [in the submissions] . . . you were thinking [] that this client of yours was about to be criminally prosecuted.

**Pillsbury**: That's right, your honor, but at the same time—

**Court**: That should have set off a whole lot of bells . . . as to where the money was actually really coming from. *Id.* at 16:19–25. . . . So, all I'm saying is, a million red flags, it seems to me, came up . . . when you first talked to . . . someone who was going to be criminally prosecuted for fraud. And now this guy hands you $4 million . . .and you think, 'oh well' . . . . It just doesn't ring right to me. *Id.* at 18:12–20.

What's happened to the four million? . . .

3

**Pillsbury:** We've been billing against the four million, and at this point it's exhausted.

**Court:** So there is no money?

**Pillsbury:** That's correct, your Honor. . . .

**Court:** That's pretty aggressive. . . . That's not the end of the story. If you are not right, you are going to have to cough up that $4 million.

[to the SEC] Did you understand that the money is gone?

**SEC:** No, your honor . . . . *Id.* at 20:2–7, 20:14–16.

**Court:** We only know that today because I asked the question. . . . *Id.* at 23:7–8.

[to the SEC] Is it your position that they [Pillsbury] were billing against this $4 million at their own risk, so to speak?

**SEC:** Absolutely, your honor. They did this in secret, at least with respect to the SEC. The asset freeze was put in place. They received $4 million a couple of days before that. They didn't say a word to the SEC until September 2022. But, importantly, again, when they made this disclosure in September 2022, what they told the SEC is that they held a retainer of $3.6 million that **was an asset of Mr. Rogas, held in escrow**. It's listed as an unencumbered asset. *Id.* at 28:8–22 (emphasis added).

**The Court hereby grants the SEC motion and orders Pillsbury within 20 days hereof to deposit into an independent interest-bearing escrow account the sum of $3,612,601.76, plus any accrued interest.** *See Collector's Coffee, Inc.*, 602 F. Supp. 3d 488 (S.D.N.Y. 2022); *SEC v. Princeton Economic Intern. Ltd.*, 84 F. Supp. 2d 443 (S.D.N.Y. 2000).[5]

II. <u>Background</u>

<u>Rogas Pleads to Securities Fraud</u>

On March 16, 2022, Rogas pleaded guilty to securities fraud pursuant to a plea agreement, dated March 15, 2022. Plea Hr'g Tr., 20-CR-539, dated Mar. 16, 2022, at 37:4–6 (Crim Doc. 59);

---

[5] **Any issues or arguments raised by the parties but not specifically addressed in this Decision and Order have been considered by the Court and rejected.**

4

*see also* Indictment, dated Oct. 13, 2020, at 2 (Crim. Doc. 7). He admitted that as NS8's "president and CEO, . . . [he made] material misrepresentations to potential and actual investors of NS8 inaccurately reflecting the company's revenue." *Id.* at 11:12, 12:4, 21:7–10. Rogas acknowledged that he "used materially misleading financial statements to raise approximately $123 million from investors of NS8 . . . . [He] altered bank statements to show millions of dollars of fictional customer revenue and assets. Months later, [he] directly benefited when NS8 conducted a tender offer with these new investor funds." Rogas Sentencing Letter, dated Apr. 24, 2022 (Crim Doc. 67). By tendering NS8 shares he owned, Rogas "obtain[ed] approximately $17.5 million." Sent. Tr., dated Nov. 3, 2022, at 72:13–14 (Crim. Doc. 81).

On November 3, 2022, Rogas was sentenced by the Honorable John P. Cronan to 60 months' imprisonment followed by three years of supervised release. *Id.* at 78:7–14. Rogas is currently serving his sentence in the Phoenix Residential Reentry Management facility in Arizona.

**Engagement Letter**

On September 1, 2020, Rogas and Pillsbury entered into an engagement letter. *See* SEC Motion Ex. 2, dated Sept. 1, 2020 ("Engagement Letter"), at 4. The Engagement Letter provides, among other things, the following:

> You [Rogas] have asked us [Pillsbury] to represent you in connection with employment and corporate separation advice and any attendant considerations or issues arising therefrom. . . .
>
> At this time, we are requesting a retainer in the amount of **$15,000.00** in connection with the legal services to be rendered for this representation. However, at such time as your retainer balance falls below $15,000.00, we will need an immediate replenishment to the original retainer amount of $15,000.00 or our firm will cease all work.

5

*Id.* at 1, 5 (emphasis added).[6]

The "engagement letter called for a modest retainer for Mr. Sullivan and Pillsbury to work against, which would need to be continually replenished." Rogas Decl. at ¶ 5. According to Pillsbury partner William Sullivan, the Engagement Letter provided that "Rogas would remit and continually replenish a **small** retainer, without which work on his behalf would cease." Sullivan Decl., dated May 17, 2024 at ¶ 4 (emphasis added). The SEC points out that "[t]here is no engagement letter or retainer agreement by which Pillsbury required a $4 million retainer." SEC Motion at 4.

Days after signing the Engagement Letter, Rogas spoke with Sullivan and his Pillsbury partner, Thomas Hill, as well as their associate, Alex Anderson, during a "multi-hour call." Rogas Decl. at ¶ 6. Rogas provided a "comprehensive recitation of [his] time with NS8 and actions [he] had taken in [his] capacity as President and CEO." *Id.* "It was immediately apparent that Mr. Rogas would likely be facing criminal, SEC and civil investigations and litigation." Sullivan Decl. at ¶ 7. Following the call, Mr. Sullivan advised Rogas that, "based upon his understanding of the facts at that time, [Rogas] was very likely to face serious government investigations and related civil litigation which [Rogas] would need to prepare to meet." Rogas Decl. at ¶ 7.

On September 9, 2020, Rogas "made the independent and voluntary decision to initiate . . . wire transfers to Pillsbury totaling $4,000,000." *Id.* at ¶ 9. The SEC contends that Rogas' $4 million payment to Pillsbury is "directly and easily traceable to Rogas' fraud." SEC Motion at 5; *see also* SEC Motion Ex. 6.[7]

---

[6] Pillsbury represented Rogas in both his civil and criminal cases. *See* Sullivan Decl, dated May 17, 2024, at ¶ 2.

[7] The SEC describes the trail of money as follows: (1) On June 15, 2020, "Rogas, directly and via . . . NS8 FP, LLC [a Relief Defendant], received approximately $17.5 million" from

6

### Judge Crotty's Temporary Restraining Order

On September 14, 2020, the SEC sought (and obtained) "on an *ex parte* emergency basis [] an order freezing assets . . . against Defendant Adam Rogas and Relief Defendants NS8 FP, LLC, MVP 2020, LLC, and Rogassi Enterprises, LLC in order to prevent further misappropriation of investor funds and provide a corpus for returning investor funds to investors." SEC Emergency Motion for TRO, dated Sept. 14, 2020, at 1. The SEC was "concerned that, if Defendant or Relief Defendants [became] aware of this action before the asset freeze is [was] instituted, they will have an opportunity to transfer or otherwise dispose of Rogas's ill-gotten gains." *Id.* at 2. There was a "serious risk that the assets will be dissipated." SEC Brief Supporting Motion, dated Sept. 14, 2020, at 15.[8]

On September 17, 2020, Judge Crotty granted the SEC's application for the TRO finding that "[t]here is good cause to believe that, unless funds and assets are frozen by order of this Court, the Defendant and Relief Defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil money penalties in this action." TRO, dated Sept. 17, 2020, at 2. "To avoid irreparable harm, it is appropriate for the Court to issue this Order *ex parte* so that prompt service on appropriate financial

---

"NS8's fraudulent offering"; (2) on June 22, 2020, Rogas transferred "$10 million of [the $17.5 million] into a Silicon Valley Bank account"; (3) on July 24, 2020, "Rogas wired that $10 million into another account . . . owned by Phuturecorp, Inc. (another entity Rogas controlled)"; and (4) "on September 9, 2020, Rogas—via the Phuturecorp [] account—sent $4 million to Pillsbury." SEC Motion at 5; *see also* SEC Motion Ex. 6.

[8] The SEC also sought to "freeze $35,084,900 of Defendant and Relief Defendant's assets; an amount sufficient to cover disgorgement of $17,542,450 and a civil penalty in the amount equal to disgorgement of $17,542,350." SEC Brief Supporting Motion, dated Sept. 14, 2020, at 16.

7

institutions and persons acting in concert with or directing the activities of Defendant and Relief Defendants can be made, thus preventing the dissipation of investors funds." *Id.* at 1.

The TRO requires, as noted, that "Defendant, Relief Defendants, and their officers, directors, successor corporations, subsidiaries, affiliates, trustees, family members, agents, servants, employees, **attorneys-in-fact**, and those persons in active concert or participation with them who receive actual notice of this order . . . shall . . . prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control . . . , in whatever form such assets may presently exist and wherever located, up to $35,084,900." *Id.* at I.B (emphasis added).

Rogas and Pillsbury were served with the TRO on September 18, 2020. *See* SEC Motion at 3; Sullivan Decl. at ¶ 11.

**Freeze Order**

On September 23, 2020, Rogas and the SEC applied for a Freeze Order to extend the TRO "pending resolution of the merits of this matter through trial or otherwise." Joint Application for Entry of Asset Freeze, dated Sept. 23, 2020, at 1–2. On September 24, 2020, Judge Crotty froze "$35,084,900 of funds and other assets of Defendant Adam Rogas . . . wherever located pending resolution of the merits of this matter through trial or otherwise." *Id.* at 1–2.

**III. Legal Standard**

"It is well-settled that a defendant has no right to use tainted assets for his legal defense." *SEC v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023). A defendant has no "right to spend another person's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain the attorney of his choice." *Caplin & Drysdale v. United States*, 491 U.S. 617, 626 (1989).

8

A "security retainer" is an arrangement "where the lawyer holds the money solely to secure the ability of the client to pay for the services the client expects the lawyer to render in the future." *Ruberto v. DeFilippo*, 913 N.Y.S.2d 889, 891 (N.Y. Civ. Ct. 2010); *see also In re Dewey & Leboeuf LLP*, 493 B.R. 421, 429 (Bankr. S.D.N.Y. 2013). An "advance payment retainer" entails "the client pay[ing] the attorney in advance for all or some of the legal services." *Ruberto*, 913 N.Y.S.2d at 891.

## IV. <u>Analysis</u>

### A. Rogas' $4 Million Payment to Pillsbury was Subject to the TRO and the Freeze Order

The SEC argues persuasively that the $4 million transfer was a security retainer and was the property of Rogas. *See* SEC Motion at 10. A security retainer "remains the property of the client until the attorney applies it to charges incurred for services actually rendered." *In re Dewey & Leboeuf LLP*, 493 B.R. 421, 429 (Bankr. S.D.N.Y. 2013). The TRO and the Freeze Order applied equally to the property of Rogas, including the $4 million he transferred. SEC Motion at 11. The SEC contends correctly that "[t]he payment structure of the signed engagement letter, a $15,000 retainer to be replenished periodically, comports with the structure of security retainers." *Id.* at 11. Pillsbury unpersuasively claims that the "$4 million remittance to Pillsbury is an advance payment retainer" and was "outside the Freeze Order's scope." Def. Cross Motion at 3, 7.

The Court finds that Rogas' $4 million funds which Rogas transferred to Pillsbury on September 9, 2020 were a security retainer, i.e., "a payment made to an attorney to secure payment of fees for prospective services." *See In re King*, 392 B.R. 62, 70 (Bankr. S.D.N.Y. 2008). And, because Judge Crotty's TRO unambiguously included Rogas' property held by Pillsbury as his "attorneys-in-fact" this Court confirms that the TRO froze $3.6 million held by Pillsbury.

9

The Engagement Letter outlines a "security retainer" under New York Law. *See* SEC Opp., dated May 31, 2024, at 5. That is, the Engagement Letter obligates Rogas to deposit $15,000 in order to secure legal representation. Only "at such time as [the] retainer balance falls below $15,000," Pillsbury "will need an immediate replenishment of the original retainer amount." Engagement Letter at 5. Rogas "understood that [he] still had the right to . . . terminate the representation at any time if [he] so [chose], and to the return of any remainder of the retainer funds paid to Pillsbury at the conclusion of services." Rogas Decl. at ¶ 13; *see also In re Level 8 Apparel LLC*, 2023 WL 2940489, at **20–21 (Bankr. S.D.N.Y. Apr. 13, 2023).[9]

## B. Pillsbury Disregarded the Freeze Order

The Court agrees with the SEC that Pillsbury should have timely sought "court approval for a carve-out to bill against Rogas' frozen funds;" i.e., Pillsbury should certainly have done so much sooner than May 17, 2024. SEC Motion at 6; *see, e.g.*, *SEC v. FTC Capital Markets*, 2010 WL 2652405, at *3 (S.D.N.Y. June 30, 2010) (where the court stated that "a defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney,

---

[9] Even if Rogas' funds were an advance payment retainer, $3.6 million was subject to the TRO and the Freeze Order.

The SEC argues persuasively that "[e]ven if the $4 million transferred to Pillsbury were . . . an advance payment retainer, . . . the unearned portion of the funds were . . . held by Pillsbury in the name of, for the benefit of, or under the control of Rogas and frozen by the [] Freeze Order." SEC Opp. at 9. Pillsbury contends that the TRO and Freeze Order do not apply because "such funds were not Mr. Rogas's property, were not held in his name, were not held for his benefit, and were not controlled by him when the freeze was entered." Def. Cross Motion at 11.

The Court finds that Rogas did, in fact, retain an interest in that portion of the retainer that was not yet earned. *See* Committee on Professional Ethics, Ethics Opinion 816, New York State Bar Association, ¶ 8 (Oct. 26, 2007); *see also Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212, 219 (S.D.N.Y. 1997). "The mere fact that the client advances money through retainer payment does not entitle the attorney to claim 'ownership' of the funds at the moment of receipt. It is in effect money of the client to be held in constructive trust with the attorney being entitled to payment as he performs work. If the attorney does not perform the work he must return the money." *In re Level 8 Apparel LLC*, at *20.

10

even if those funds are the only way that defendant will be able to retain the attorney of his choice"). Pillsbury also contends that Rogas' funds were "held in Pillsbury's operating account and neither Pillsbury nor Mr. Rogas viewed the freeze order as covering" the funds. Sullivan Decl. at ¶ 12. According to Pillsbury, because the "funds were no longer Mr. Rogas's assets . . . Mr. Rogas was under no obligation to seek a 'carve out' for funds not covered by the freeze." Def. Cross Motion at 11.

The SEC correctly points out that "[a]t no point during the multi-year representation did Pillsbury file a motion for a release of any funds to pay legal fees." SEC Motion at 7. In fact, Pillsbury failed to seek approval from the Court until May 17, 2024 which was 43 months after Pillsbury received notice of the TRO. And, it was only after the SEC moved to compel Pillsbury to turn over the funds that Pillsbury filed a motion for "confirmation." *See* Def. Motion, dated May 17, 2024, at 1; *see also SEC v. Credit Bancorp, Ltd.*, 109 F. Supp. 2d 142, 143 (S.D.N.Y. 2000) (where the court found that retainer funds "at the time of the freeze order were still property of [the defendant]"); *SEC v. Abdallah*, 2015 U.S. Dist. LEXIS 183433, at **5, 10–11 (N.D. Ohio Jan. 23, 2015) (where the court found that "any funds not applied to invoices before the Asset Freeze Order remained the property of Defendant" and were "within the scope of the Asset Freeze Order"; and ordered the law firm to "turn over any funds applied to invoices after the Asset Freeze Order . . . [to] the Receivership Estate"); *United States v. Rapower-3*, 2020 U.S. Dist. LEXIS 143167, at **3, 7–8 (D. Utah July 6, 2020) (where the court found that a $700 thousand retainer was "client property" and subject to a freeze order and ordered the law firm "to turn [the funds] over to the Receiver").

"[W]here a defendant in a civil enforcement action seeks to lift an asset freeze to retain counsel in a parallel criminal action, a court must determine whether (1) the defendant has

11

demonstrated a need for the relief; (2) if so, the defendant has demonstrated that the assets for which release is sought are [not] traceable to criminal activity; and (3) the defendant has shown that the value of the assets sought to be released is reasonable." *SEC v. McGinn, Smith & Co.*, 2014 WL 12600470, at *6 (N.D.N.Y. Jan. 8, 2014). In the instant case, neither Rogas nor Pillsbury have demonstrated a need for relief or that the $4 million payment to Pillsbury was not traceable to criminal activity. *See infra* at page 5.[10]

## C.    Pillsbury Exhausted (Depleted) Rogas' Funds which were Subject to Judge Crotty's Freeze Order

The Court finds that (i) the Rogas funds were covered by the TRO and the Freeze Order and that Pillsbury had received notice of the freeze no later than September 18, 2020, *see infra* Section IV.A; and (ii) the Rogas funds were spent down by Pillsbury without seeking Court approval (or "clarification" or "confirmation") from the Court. *See, e.g., Collector's Coffee, Inc.*, 602 F. Supp. 3d 488, 504 (S.D.N.Y. 2022) (where the court found that the "the right to file, pursue, and settle claims in a lawsuit was 'frozen' by the TRO"; and the "TRO was agreed to by [defendant] and [the defendant] has provided no basis for modifying it at this late date.").

In fact, Pillsbury partner Sullivan admitted during oral argument on July 10, 2024 that Rogas' transferred funds had been "exhausted." Oral Arg. Tr., dated July 10, 2024, at 20:5. Pillsbury "dissip[ated]" and "dispos[ed]" of Rogas' assets, notwithstanding the unambiguous language of the Freeze Order which required Pillsbury to "prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever" of Rogas' assets.

---

[10] Courts often deny the release of frozen funds to pay defense counsel where a party makes "no showing that the funds he seeks are not part of the securities fraud." *SEC v. Callahan*, 2014 WL 11343760, at *4 (E.D.N.Y. May 17, 2014). Neither Rogas nor Pillsbury have shown that the frozen assets should or would have been released. As the SEC points out, "if Pillsbury had sought a carve-out from the [] Freeze Order to use the $4 million for legal fees, it likely would have been denied." SEC Motion at 9.

Freeze Order at I.B. Pillsbury delayed any application to the Court for authorization and instead violated unambiguous language of the Freeze Order which was intended to prevent Rogas' "attorneys-in-fact," among others, from "any disposition, . . . encumbrance, . . . dissipation, . . . or other disposal whatsoever of any of [Rogas'] funds or other assets . . . presently held by them [or] under their control." *Id.*

The Court finds that Pillsbury dissipated and disposed of $3,612,601.76 of Rogas' assets which had been transferred on September 9, 2020 to Pillsbury. "In fashioning appropriate relief, we are mindful that our goal is to secure compliance both with the language the TRO that 'freezes' the assets and also the language that prevents the 'dissipation' of assets." *Collector's Coffee, Inc.*, 602 F. Supp. 3d at 506. The District Court has a "sweeping mandate manifest in the securities laws" to "fashion ancillary relief when its jurisdiction under those law has been involved." *Smith v. SEC*, 653 F.3d 121, 129 (2d Cir. 2011); *see also* 15 U.S.C. § 78u(d)(5) ("Federal court may grant[ ] any equitable relief that may be appropriate or necessary for the benefit of investors."); *SEC v. Collector's Coffee*, 19-CV-4355, Order, dated May 17, 2022, at 2 (ordering that the asset freeze funds "be placed in escrow").

The SEC's motion in this case was filed on May 3, 2024 "so that the funds may be available to repay the victims of Rogas' fraud." SEC Motion at 1. *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (An asset freeze order "assures that any funds that may become due can be collected."); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972) ("One of the chief reasons for requiring defendants to refund illegally obtained proceeds . . . is to compensate defrauded investors.").

The Court grants the SEC application to compel Pillsbury to "turn over . . . $3,612,601.76 of Rogas' assets" which Pillsbury held on "September 18, 2020, the date Pillsbury was served with

the initial [] Freeze Order." SEC Motion at 1, 10.[11] The Court also grants the SEC request that Pillsbury turn over "any gains that it has obtained from holding the frozen funds [$3,612,601.76] since the imposition of the asset freeze." SEC Motion at 2; *see SEC v. Tavella*, 77 F. Supp. 3d 353, 361 (S.D.N.Y. 2015) (frozen funds "should be turned over along with any interest that has accrued on them during the freeze period"). Pillsbury can only "return a sum equal to the amount wrongfully obtained, rather than . . . replevy a specific asset." *SEC v. Rosenthal*, 426 Fed. App'x. 1, 3 (2d Cir. 2011); *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000). If a court were only to order the return of the actual assets unjustly received, that "would lead to absurd results." *Banner*, 211 F.3d at 617.

## V.    Conclusion & Order

Pillsbury is ordered and directed to within 20 days hereof deposit into an interest-bearing escrow account for the benefit of innocent investors held by an independent escrow agent $3,612,601.76 along with any interest that accrued on those funds during the duration of the Freeze Order. Pillsbury is also directed to advise this Court when the escrow account is established.



Date:  December 2, 2024
New York, New York

RICHARD M. BERMAN, U.S.D.J.

---

[11] The SEC contends that "at least $3,612,601.76 belonged to Rogas [and was held by Pillsbury] as of September 18, 2020, the date Pillsbury was served with the initial Asset Freeze Order." SEC Motion at 10. At the oral argument held on July 10, 2024, the SEC noted that they "do not believe [they] have an exact calculation of that amount [of funds held by Pillsbury on September 18, 2020] because . . . there's a billing cycle that may have overlapped with the asset freeze." Oral Arg. Tr., dated July 10, 2024, at 5:19–21. The Court finds that, based upon Rogas' Accounting and Pillsbury's invoices, the SEC has demonstrated that it is appropriate for Pillsbury to turn over $3,612,601.76 plus interest. *See* SEC Motion at 13.